UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BERGEN BEVERAGE DISTRIBUTORS LCC, et al.** | |
| Plaintiffs, | Civ. No. 2:17-cv-04735 (WJM) |
| v. | |
| **EASTERN DISTRIBUTORS, INC., et al.,** | OPINION |
| Defendants. | |

## WILLIAM J. MARTINI, U.S.D.J.:

Presently pending in this breach of contract and tort action are two motions for summary judgment pursuant to Fed. R. Civ. P. 56: 1) Plaintiffs Bergen Beverage Distributors, LLC and George Lawler (jointly "Bergen") and David Johnson, Joann Young, and Yojo Corp. (jointly "Yojo") (collectively "Plaintiffs") move for partial summary judgment on liability against Defendants Eastern Distributors I, Inc. ("Eastern") and The Route Brokers ("Rte. Brokers"), ECF No. 123; 2) Defendant Eastern moves for summary judgment dismissing the claims against it and for judgment on its counterclaim against Bergen, ECF 124. The Court decides these motions without oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Plaintiffs' motion for partial summary judgment is **denied.** Eastern's motion for summary judgment is **denied in part and granted in part.**

### I.   BACKGROUND AND PROCEDURAL HISTORY

Eastern is a reseller of exclusive routes for distribution of specific Coca-Cola beverage products in certain territories in New Jersey and in other states in the tristate region. Compl., ¶ 11, ECF No. 1. Bergen and Yojo are unrelated parties that each purchased new beverage distribution routes from Eastern. *Id.* at ¶ 14. Rte. Brokers brokered the transaction. *Id.* at ¶ 17.

#### A.   Rte. Brokers

Plaintiffs initially learned about territories being offered for sale by Eastern through an advertisement placed by Rte. Brokers that offered the opportunity to buy a distributorship that included a "Protected, Metro NY/NJ Territory" as well as "200 Target Accounts / Territory," "Newly Decaled Refrigerated Truck," and "Training by Simply

Orange/Coca-Cola Sales Team," by "invest[ing] as little as $119,000 total," and that "after all expenses you can net $2,000/week." George Lawler Decl., ("Lawler Decl."), ¶ 3, Ex. A, ECF No. 101-7; David Johnson Decl. ("Johnson Decl."), ¶ 5, ECF No. 101-6.[1]

Rte. Brokers verbally made the same representations to Plaintiffs described in the advertisement. Lawler Decl., ¶ 7; Johnson Decl., ¶ 9. Subsequently, Rte. Brokers entered into a broker agreement with Bergen on June 12, 2015 and with Yojo on June 15, 2015 ("Broker Agreements") authorizing Rte. Brokers to submit an offer to Eastern for the purchase of a "new route distributorship" defined by specified zip codes in northern New Jersey. As part of the purchase price, Plaintiffs were to receive a "2005 or newer refrigerated truck" and a promise that a "Third Party Sales Team . . . will solicit at least 200 Target Accounts in the Buyer's territory" for certain branded products. Lawler Decl., ¶ 6, Ex. B; Johnson Decl., ¶ 8, Ex. A.

B. Eastern

Plaintiffs met with Ed Marinaccio, the owner of Eastern, who purportedly represented that: they would receive an additional 100 accounts in their respective territories, Lawler Decl., ¶ 21, Johnson Decl., ¶ 23; Yojo would earn $2000 per week, Johnson Decl., ¶ 11; and Coca-Cola would be "part of the deal," Lawler Decl., ¶ 40. Defendants did not provide Plaintiffs any financial records or projections specific to the territories that they were to purchase. Lawler Decl., ¶ 10; Johnson Decl., ¶ 13. Because the routes were new, there were no pre-existing customers. Bergen and Yojo selected the zip codes for their respective territories. Eastern's Separate Stmt. Of Undisputed Facts ("SSUF"), ¶ 15, ¶ 45; Declaration of Harry Tilis ("Tilis Decl."), Ex. C (Lawler Dep.), 19:9-15, ECF 124-6; Tilis Decl., Ex. F (Johnson Dep.), 36:5-7, ECF No. 124-9.

On July 8, 2015, Bergen entered into a ten-year term Independent Operator Distribution Agreement with Eastern to purchase territory in certain New Jersey zip codes for $129,000 ("Bergen Agreement"). Lawler Decl., ¶ 8; Bergen Agreement attached to Lawler Decl. as Ex. C. Bergen paid $79,000 directly to Eastern at the time of the purchase and was to pay the remaining $50,000 balance pursuant to a promissory note ("Promissory Note"). *Id*; Promissory Note, Tilis Decl., Ex. B, ECF No. 124-5. In addition to the $79,000 initial payment, Bergen paid Eastern a $6,000 deposit plus $104,944 during the life of the territory. Lawler Decl., ¶ 39.

On August 6, 2015, Yojo entered into a ten-year term Independent Operator Distribution Agreement with Eastern to buy the territory in certain New Jersey zip codes for $119,000 ("Yojo Agreement"). Johnson Decl., ¶ 11; Yojo Agreement attached to

---

[1] The Court did not consider statements in the supporting Declarations that are conclusions rather than facts made on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4).

Johnson Decl. as Ex. B. The territory purchased by Yojo differs from that purchased by Bergen. Johnson Decl., ¶ 12.

The Bergen and Yojo Independent Operator Distribution Agreements (jointly "Distribution Agreement" or "Agreement")[2] state in the Preamble that Eastern has the "exclusive rights to establish Independent Operator Routes," and cannot enter into "any agreement inconsistent with the distribution appointment of the Independent Operator . . . including any agreements with other entities which sell or distribute Competitive Products." Agrmt., ¶ 8.2.3(b). The "Territory" in which Plaintiffs may distribute Products are "small format stores, markets and retailer sellers of the products under this agreement" that are within the specified Northern New Jersey zip codes in which "Independent Operator [Plaintiffs] will distribute Products on its Approved Route" and in the unassigned "Gray Zone." *Id.* at ¶ 4.5. "Approved Routes" are defined as the distribution route "within the five boroughs of New York City and Long Island as described in Exhibit A" although Exhibit A references the "Zip Codes listed in [¶] 4.5," which are Northern New Jersey zip codes. Notably, ¶ 4.9.2 requires Plaintiffs "to supply refrigerated trucks in proper working order."

The Agreement mandates that Eastern "assist Independent Operator [Plaintiffs] with the marketing of Products on the Approved Routes and will use good faith efforts to honor all reasonable requests for promotional support." *Id.* at ¶ 7.5. Coca-Cola is also to "assist each driver with development, marketing and sales as listed in Exhibit C." *Id.* at ¶ 4.7. Exhibit C states that the assistance Plaintiffs are to receive include:

- "A protected primary territory from other Independent Operator's – that includes a minimum of 200 target retail outlets – as defined by zip codes in Brooklyn, Bronx, Manhattan, Queens, Staten Island, Long Island or West Chester County."

- "Support of a 3rd party retail team, to assist Independent Operator's [sic] under contract with market development, new account penetration, and training. This includes a sales blitz whereby all target accounts in the Primary Territory will be solicited, in person, to secure new distribution."

- "NEW retail accounts will be supported with new distribution incentive . . ."

- "An annual promotional program, whereby discounts will be offered a) periodically on select items, b) through an everyday low cost program on select brand pack(s), and/or c) on an everyday basis for select brand pack(s); collectively to be provided if volume purchase requirements are met."

---

[2] All contractual provisions that are at issue in this motion are the same in both the Bergen and Yojo Distribution Agreements unless otherwise noted. Accordingly, for simplicity, the Agreements will primarily be referred to in the singular.

3

- "Depending on availability, re-purposed refrigerated trucks will be made available to Independent Operators . . ."

*Id.* at Ex. C. Paragraph 2.7 states that Eastern "shall (if applicable) provide a Volume-Based Incentive to reward [Plaintiffs] for achieving the Volume Target in each Agreement Year." According to ¶ 2.8, a "reasonable annual volume goal for the Approved Route will be mutually agreed upon by Distributor and Independent Operator by January 31, of each Agreement Year during the Term." The Agreement's integration clause provides in part, that "neither of the parties is entering into this Agreement on the basis of any representation or promise not expressly contained herein." *Id.* at ¶ 26.1.

Bergen ceased operating the territory in about July 2017 after losing a purported substantial sum of money from the routes. Lawler Decl., ¶¶ 34, 39. Similarly, by the summer of 2016, Yojo decided it needed to sell its territory because it could not afford to continue. Johnson Decl., ¶ 39. Yojo contends that it paid Eastern "tens of thousands" in addition to the $119,000 it initially paid for the territory. *Id.* at ¶ 44.

Plaintiffs filed suit against Eastern and Rte. Brokers on June 27, 2017[3] alleging: 1) breach of contract against Eastern (First Count) and against Rte. Brokers (Second Count); 2) breach of implied covenant of good faith and fair dealing against Eastern (Third Count) and against Rte. Brokers (Fourth Count); 3) fraud and negligent misrepresentation against Eastern and Rte. Brokers (Fifth Count); and 4) negligence and breach of duty against Eastern and Rte. Brokers (Sixth Count). Plaintiffs attribute their financial losses to Eastern's failure to provide an exclusive or "protected" distribution route or 200 minimum target outlets, allowing other sellers of Eastern products in their territories by the time the Agreements were executed, unilaterally setting unachievable volume targets, not providing trucks in working order, giving little marketing support, and offering promotional programs such as taste tests that were only available in New York. Eastern disputes that it breached any portions of the Agreement and instead, believes that Plaintiffs did not use their "best efforts to aggressively develop accounts" within their territories as required by ¶ 7.4 of the Agreement, and that Plaintiffs' efforts were short-lived.

Plaintiffs now move for summary judgment against Eastern and Rte. Brokers on liability and for damages to be determined at trial. Eastern moves for a judgment of dismissal as to Plaintiffs' claims arguing that there are no genuine issues of material fact and that the tort claims are barred by the economic loss doctrine and the Agreement's integration clause. Eastern also seeks judgment on its counterclaim on the Promissory Note against Bergen with damages to be determined at a subsequent hearing.

## II.   STANDARD

---

[3] Coca-Cola was dismissed as a defendant on November 28, 2017. *See* November 28, 2017 Op., ECF No. 38.

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (emphasis in original and internal quotation marks omitted). In other words, "unsupported assertions, speculation, or conclusory allegations" are insufficient to defeat a summary judgment motion. *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d. Cir. 2003). "[T]here must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The Court's role at the summary judgment stage "is 'not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 249). In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

## III. DISCUSSION

### A. Breach of Contract Against Eastern (First Count)

Under New York law,[4] the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *See Swan Media Group, Inc. v. Staub*, 841 F.Supp.2d 804, 807 (S.D.N.Y. 2012) (citing *Eternity Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004)).

---

[4] Paragraph 22 of both Distribution Agreements provide that "[t]he validity and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York." The parties do not dispute that New York law applies to contract claims.

5

In deciding whether there has been a breach of contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assoc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996). The threshold question in the court's inquiry is whether the contract is ambiguous. *Alexander & Alexander Serv., Inc. v. Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). Contract terms are ambiguous if they suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997). "A contractual provision is not ambiguous merely because the parties urge different interpretations of it." *Pfizer, Inc. v. Stryker Corp.,* 348 F. Supp. 2d 131, 142 (S.D.N.Y. 2004) (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)). "[O]nly where the language *and* the inferences to be drawn from it are unambiguous may a district court construe a contract as a matter of law and grant summary judgment accordingly." *Alexander,* 136 F.3d at 86. (internal quotations and citation omitted)). When a contract is not ambiguous, the interpretation of that contract is a question of law, *see Pfizer,* 348 F. Supp. 2d at 142, and the court "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." *Alexander,* 136 F.3d at 86. Here, the parties do not argue that the Agreement is ambiguous despite their disagreement as to the interpretation of its terms.

As discussed below, the Court finds that there are genuine issues of material fact as to many of the terms of the Agreement thus precluding summary judgment on the breach of contract claim in favor of either side.

1. Exhibit C

    a. *200 Target Accounts in "Protected Territory"*

In moving for summary judgment, Eastern contends that any obligation promised in Exhibit C to deliver "200 target retail outlets" within a "protected" territory is 1) Coca-Cola's obligation rather than Eastern's, and that in any event, 2) that provision is expressly applicable only to target accounts located within New York. Both contentions are without merit. As to the first issue, Eastern posits that under ¶ 4.7, the entire "concept of protected territory" as well as any obligations referenced in Exhibit C are part of the "Company Assistance Program" that *Coca-Cola* is obligated to provide. However, ¶ 4.7 only provides that Coca-Cola will "*assist* each driver with *development, marketing and sales*" as listed in Exhibit C. (emphasis added). Neither ¶ 4.7 nor Exhibit C states that it is Coca-Cola's contractual duty to provide Plaintiffs with "protected" or exclusive territories. Moreover, Coca-Cola cannot be obligated to perform under a contract to which it is not even a party.

Second, the Court agrees with Plaintiffs that the reference to zip codes in the five New York boroughs, Long Island, and Westchester County are typographical errors.

Principles of contract interpretation require contracts to be interpreted to give meaning and effect to every contract provision. *See M & T Bank Corp. v. LaSalle Bank Nat. Ass'n*, 852 F. Supp. 2d 324, 333 (W.D.N.Y. 2012). If the references to New York in Exhibit C are not a mistake as Eastern argues, then Exhibit C would be entirely superfluous because it would *never* be applicable given that the specified territories are all in Northern New Jersey. Moreover, ¶ 2.2 also contains reference to "Approved Routes" in "the five boroughs of New York City and Long Island as described in Exhibit A" although the purchased zip codes are indisputably in New Jersey. Thus, concluding that the parties intended such references to New York territories would deprive Plaintiffs of the benefit of their bargain – exclusive approved routes in New Jersey. There is no reasonable basis to interpret the Exhibit C provision at issue as anything other than a typographical error.[5]

Even if the Court were to find this portion of Exhibit C to be ambiguous, the Broker Agreements show that the parties intended Plaintiffs to receive "at least 200 Target Accounts in the Buyer's territory" comprised of northern New Jersey zip codes. *See* Broker Agmts; *see Alexander*, 136 F.3d at 86 ("If the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.") Thus, Eastern is contractually obligated under Exhibit C to provide Plaintiffs a minimum of 200 target outlets within their respective territories.

However, Plaintiffs contend that Eastern did not provide anything close to "200 target retail outlets"[6] in their territories. Lawler Decl., ¶ 20 (alleging list of target accounts numbered "137 locations" but was defective and only contained 37 "potential accounts"), Exs. E and F (October 27, 2016 email from Lawler referring to list from Coca-Cola); Johnson Decl., ¶¶ 30, 32 (stating target accounts were "somewhere over a hundred" and were not type of businesses to purchase products at issue and were too spread out to be viable). Although Eastern's response is conclusory and notes that Plaintiffs were free to sell products inside the specified zip codes that Plaintiffs alone chose, the Court, in viewing the evidence in the light most favorable to the nonmoving party, is unwilling to find that Plaintiffs' proofs, which consist of a single email and self-serving declarations, are sufficient to satisfy Plaintiffs' burden on summary judgment.

Next, Plaintiffs assert that they did not receive a "protected" territory because other sellers of Eastern products were in their territory and that Eastern, upon learning that one of its own suppliers was operating in the protected territory, failed to take corrective action. Eastern does not deny that there were other sellers of the same products in Plaintiffs' territories but notes there is no evidence showing that Eastern permitted others to sell in the protected areas or contracted with other parties to "sell or distribute Competitive

---

[5] Another typographical error in the Yojo Agreement is that all of the zip codes listed in ¶ 4.5 are only four digits.

[6] To the extent that Plaintiffs construes the 200 target accounts as guaranteed accounts, Exhibit C of the Agreements expressly provides for account *targets* rather than *guarantees*.

7

Products" in violation of ¶ 8.2.3. Additionally, Eastern claims that it did not have an affirmative obligation to police Plaintiffs' competitors or to litigate against or otherwise enforce Plaintiffs' rights against others. The Court concludes that genuine issues of material fact exist regarding whether actual sales occurred and if so, whether Eastern caused those sales to occur in violation of ¶ 8.2.3 or its contractual obligation to provide "protected" territory.

### b. *Marketing and Promotional Assistance*

Plaintiffs claim that they received little to no promotional programs, distribution incentives on new accounts, support from a "3rd party retail team" to assist with "market development, new account penetration, and training" including a "sales blitz" to solicit all target accounts in the territory in breach of the terms of Exhibit C.

While not denying that certain promotional programs were not available in New Jersey, Eastern suggests that this portion of Exhibit C is reserved for New York accounts. Exhibit C, however, does not expressly state that promotional programs are available only to territories in New York. Eastern also disputes that it had certain marketing obligations because ¶ 4.7 provides that marketing assistance was Coca-Cola's responsibility. The Court disagrees. Pursuant to ¶ 7.5, *Eastern* was required to provide marketing and promotional assistance to Plaintiffs.

There are, however, genuine issues of material fact that preclude summary judgment. For example, the fact finder must decide whether the 3rd party retail team support that Plaintiffs did receive was sufficient to satisfy the terms of the Agreement. *See* SSUF, ¶ 28; Joseph Guarino Dep. Tr. at 15:2-16:23, attached as Ex. C to Tilis Decl., ECF No. 126-8.

### c. *Trucks*

Pursuant to ¶ 4.9.2, it was Plaintiffs' responsibility to obtain trucks. However, Exhibit C to the Agreement states that "re-purposed refrigerated trucks will be made available" to Plaintiffs "[d]epending on availability." According to Plaintiffs, Eastern provided trucks that were in substantial disrepair and required thousands of dollars in repairs. Lawler Decl., ¶ 31; Johnson Decl., ¶ 33. As Eastern notes, Plaintiffs have not submitted any repair bill, service order, or other evidence that the trucks were in fact in disrepair. The parties' dispute over each parties' responsibility under Exhibit C in conjunction with ¶ 4.9.2 as well as whether any "available" re-purposed trucks were in working order present genuine issues of fact to be determined at trial.

### 2. Paragraphs 2.7 and 2.8

8

Paragraphs 2.7 and 2.8 authorize a "Volume-Based Incentive" to reward Plaintiffs for achieving a "reasonable annual volume goal" that is to be "mutually agreed upon" by the parties annually. Plaintiffs contend that the volume goals were unilaterally set by Eastern and were not reasonable. Eastern explains that the parties were not able to mutually agree on the volume target and disagrees that any volume goals were impossible to achieve. The term "reasonable" is not defined in the Agreements and is subject to more than one interpretation. Furthermore, it is unclear from the face of the Agreements whether the parties intended the "agreement to agree" on annual volume goals to be enforceable and if so, what the term of that enforcement would be.

In light of the triable issues of fact regarding various terms of the Agreement as well as Eastern's contention that Plaintiffs did not perform under the Agreement by not vigorously promoting and selling products in their routes, the Court **denies** both Plaintiffs' and Eastern's motions for summary judgment on the First Count for breach of contract.

### B. Breach of Contract Against Rte. Brokers (Second Count)

Plaintiffs contend that Rte. Brokers breached the Broker Agreements by failing to submit an offer that resulted in Plaintiffs obtaining a territory with 200 target accounts to be solicited. Although Rte. Brokers has not filed any opposition to Plaintiffs' motion for summary judgment, the Court may grant summary judgment only if the facts that have not been disputed by Rte. Brokers "show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Plaintiffs have not made such a showing. The Broker Agreements authorize Rte. Brokers "to transmit" the purchase offer that included a "Third Party Sales Team" soliciting "at least 200 Target Accounts in the Buyer's territory." It is unclear from the Broker Agreements and the facts presented by Plaintiffs what the "Third Party Sales Team" is, what the relationship is between Rte. Brokers and "Third Party Sales Team," and whether Rte. Brokers contractually agreed merely to "transmit" the purchase offer or its performance required the actual solicitation of the 200 target accounts. Plaintiffs' motion for summary judgment on the Second Count is **denied.**

### C. Breach of Implied Covenant of Good Faith and Fair Dealing (Third & Fourth Counts)

Plaintiffs insist that Defendants Eastern and Rte. Brokers have breached the implied covenant of good faith and fair dealing regarding the parties' expectations on matters such as 1) the 200 target accounts; 2) provision of trucks; 3) marketing assistance and promotional events; 4) reasonable volume targets. *See* Compl., Third Count ¶ 3.

"[T]he duty of good faith and fair dealing is implied in every contract." *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989). The mutual obligation to act in good faith is "generally defined by the parties' intent and reasonable expectations in entering the contract." *Id.* Breach of the implied duty of good faith "is

merely a breach of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (internal quotation marks and citations omitted); *see ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y.1997) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.") (internal quotation marks omitted). Moreover, "'the obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract.'" *Combustion Eng'g, Inc. v. Imetal*, 235 F. Supp. 2d 265, 270 (S.D.N.Y. 2002) (citing *Wolff v. Rare Medium*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002)), *as amended on reconsideration* (Jan. 6, 2003)). Rather, "[f]or a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.*, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128, 130 (1999).

While many of Plaintiffs' implied covenant claims against Eastern are redundant of their claims for breach of the express provisions of the contract, *see* discussion *supra*, a few are not. For example, Plaintiffs allege that Eastern sought to prevent performance by failing to provide available trucks in working order and making the volume objectives unreasonable. If true, these claims though not proscribed expressly in the Agreement, would frustrate the intent and expectations of the parties. Therefore, Eastern's motion for summary judgment on the Third Count is **denied**.

Although Plaintiffs' implied covenant claims do not fail as a matter of law, Plaintiffs have not met their burden to prove *prima facie* entitlement to summary judgment. As noted above, Plaintiffs submitted only self-serving conclusory declarations as evidence that the trucks were in disrepair and that the volume objectives were unreasonable. Therefore, Plaintiffs' motion for summary judgment on the Third and Fourth Counts for breach of the implied covenant claim is also **denied**.

### D. Fraud and Negligent Misrepresentation Against Eastern and Rte. Brokers (Fifth Count)

Plaintiffs allege that to induce them to enter into contract, Defendants made fraudulent statements and misrepresentations[7] regarding the future profitability and

---

[7] A federal court sitting in diversity jurisdiction must apply the forum state's choice of law rules "even where the contract contains a choice-of-law clause." *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 300 (D.N.J. 2020). The parties disagree on whether under the Agreement's choice of law provision, New York law applies to Plaintiffs' tort claims. *Compare Black Box Corp. v. Markham*, 127 F. App'x 22, 25 (3d Cir. 2005) (finding choice of law provision encompassed only agreement itself and not entire relationship between parties) *with Sullivan v. Sovereign Bancorp Inc.*, 33 F. App'x 640, 642 (3d Cir. 2002) (affirming choice of law provision was "broad and all-encompassing" to include tort claims). An in-depth choice of law analysis is unnecessary because the relevant area of New Jersey and New York law do not conflict. *See e.g.*, n.8, *infra*. The Court will apply the law of

10

exclusivity of the routes, number of targeted accounts, types of products not listed in the Agreement that Bergen would be permitted to sell, sales and marketing assistance, competitiveness of pricing, applicability of incentive or promotional programs, and working condition of the trucks provided. Compl., ¶¶ 45-55; Fifth Count ¶ 6. Eastern claims that Plaintiffs cannot establish the necessary elements of fraud and negligent misrepresentation and that those claims are barred by the economic loss doctrine and the Agreement's integration clause.

1. Elements of Fraud and Misrepresentation Claims

A successful claim for negligent misrepresentation under New Jersey law requires a plaintiff to assert factual allegations pleading three elements: "[1] the defendant negligently made an incorrect statement of a *past or existing fact*, [2] that the plaintiff justifiably relied on it and [3] that his reliance caused a loss or injury." *Schechter v. Hyundai Motor America*, No. 18-13634, 2020 WL 1528038, at *15 (D.N.J. Mar. 31, 2020) (emphasis added) (citation omitted); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997). A claim for fraudulent inducement in New Jersey also requires a plaintiff to allege "'(1) a material misrepresentation of a *presently existing or past fact*'" in addition to "(2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resulting damages.'" *Ceballo v. Mac Tools, Inc.*, No. 11-4634, 2011 WL 4736356, at *4 (D.N.J. Oct. 5, 2011) (emphasis added) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)). To defeat a defendant's motion for summary judgment, a plaintiff bears the burden to present material misrepresentation by "clear and convincing evidence." *See CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 304 (D.N.J. 2020), *reconsideration denied*, No. 15-3103, 2021 WL 1187123 (D.N.J. Mar. 30, 2021).

"Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998). Such statements may constitute "puffery" or "vague and ill-defined opinions," but are not "assurances of fact and thus do not constitute misrepresentations." *CDK Glob.*, 489 F. Supp. 3d at 305 (internal quotations and cites omitted). Although, as Plaintiffs note, "[d]eliberate misrepresentation of income from a business is a familiar category of fraud," the misrepresentations must still concern present fact. *See Trautwein v. Bozzo*, 35 N.J. Super. 270, 276 (Ch. Div. 1955), *aff'd*, 39 N.J. Super. 267 (App. Div. 1956) (alleged misrepresentations concerned present fact of amount of weekly business); *compare with VT Investors v. R & D Funding Corp.*, 733 F. Supp. 823, 838 (D.N.J.1990) (noting statements that company would soon generate positive cash flow in excess of $60,000 per month were non-actionable "puffery"). Accordingly, statements

---

New Jersey, the forum state. *See Cont'l Ins. Co. v. Honeywell Int'l, Inc.*, 234 N.J. 23, 46 (2018) ("If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue.") (internal quotes and cite omitted).

by Defendants that pertain to opinions about future events such as income or number of guaranteed accounts are not past or existing fact, but rather, non-actionable puffery or statements of future expectations. Furthermore, Plaintiffs have not presented clear and convincing evidence that Defendants knew that their statements were false nor have they identified any evidence that shows incorrect statements were made negligently.

### 2. Economic Loss Doctrine

Plaintiffs' tort claims are also barred by the economic loss doctrine. "The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract.'" *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp.2d 557, 562 (D.N.J.2002) (citing *Duquesne Light Co. v. Westinghouse Elec. Co.*, 66 F.3d 604, 618 (3d Cir.1995)).[8] The threshold "critical issue" to determine applicability of the economic loss rule, even as to pre-contract misrepresentation, is whether the alleged fraud is extraneous to the contract. *Emerson Radio Corp. v. Orion Sales, Inc.*, No. 95-6455, 2000 WL 49361, at *7 (D.N.J. 2000), *aff'd in part, rev'd in part on other grounds*, 253 F.3d 159 (3d Cir. 2001); *see e.g., Chen v. HD Dimension Corp.*, No. 10-863, 2010 WL 4721514 (D.N.J. Nov. 15, 2010) (dismissing fraudulent inducement claim as intrinsic to allegations of non-performance of contract despite pre-contract misrepresentations); *RNC Systems, Inc. v. Modern Technology Grp., Inc.*, 861 F. Supp.2d 436, 452 (D.N.J. March 20, 2012) (granting summary judgment to dismiss fraudulent inducement claims because pre-contract misrepresentations were "addressed squarely" within contract language).

Where "a pre-contractual misrepresentation relates to a defendant's future intent to perform under the contract, it will be considered intrinsic to the contract, and any related fraud claims will be dismissed." *Petric & Assocs., Inc. v. CCA Civ., Inc.*, No. A-3571-17T2, 2020 WL 3041418, at *10 (N.J. Super. Ct. App. Div. June 8, 2020) (*citing RNC*, 861 F. Supp. 2d at 451); *Wyle Inc. v. ITT Corp.*, 13 N.Y.S. 3d 375, 376 (App. Div. 2015) ("pleadings must allege misrepresentations of present fact, not merely misrepresentations of future intent to perform under the contract, in order to present a viable claim that is not duplicative of a breach of contract claim"). Moreover, a fraud or misrepresentation claim is not extraneous to the contract where there is no "independent duty imposed by law." *Petric*, 2020 WL 3041418, at *10; *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002) ("Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."). Finally, concurrent tort and contract claims are cognizable where a defendant causes "harm to the plaintiff distinct from those caused by the breach of contract.'" *Petric*, 2020 WL

---

[8] New York law also recognizes the economic loss doctrine. *See Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2nd Cir. 2000) ("economic loss rule [] prevent[s] the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort.").

3041418, at *11 (citing *Pub. Serv. Ent. Grp., Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 201 (D.N.J. 1989); *see also RNC*, 861 F. Supp. 2d at 452.

Here, Defendants' purported pre-contract misrepresentations relate to future intent to perform obligations, which are squarely addressed in the Agreement and Broker Agreements. *See* discussion *supra; see also RNC*, 861 F. Supp. 2d at 452-53; *Chen*, 2010 WL 4721514 at *8-9. As such, they are intrinsic to the contracts. Furthermore, Plaintiffs have not alleged that Defendants caused them any harm distinct from those caused by the breach of contract, nor have Plaintiffs demonstrated that Defendants owed Plaintiffs an independent duty imposed by law. *See* discussion *infra*. Accordingly, the economic loss doctrine bars Plaintiffs' Fifth Count claims. Thus, the Court need not determine whether the Agreement's integration clause also precludes misrepresentation claims. Eastern's motion for summary judgment on the Fifth Count claims is **granted** and Plaintiffs' motion for summary judgment on the Fifth Count is **denied**.

### E. "Negligence And Breach of Duty" Against Defendants (Sixth Count)

"The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages." *Robinson v. Vivirito*, 217 N.J. 199, 208, 86 A.3d 119, 124 (2014). "[A] tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." *S. Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp. 2d 370, 396 (D.N.J. 2007), *aff'd in part*, 258 F. App'x 466 (3d Cir. 2007) (internal citation omitted). *See also Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").

"A duty of care exists when an actor creates an unreasonable risk of foreseeable harm or when such a duty is judicially imposed by policy" and fairness considerations. *Nicholas v. Saul Stone & Co., LLC*, No. 97-860, 1998 WL 34111036, at *22 (D.N.J. June 30, 1998), *aff'd*, 224 F.3d 179 (3d Cir. 2000); *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993). To determine the existence of a duty, the court makes a "value judgment" that requires a 'weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.'" *Nicholas*, 1998 WL 34111036, at *22 (*citing Goldberg v. Housing Auth. of Newark*, 38 N.J. 578, 583, 186 A.2d 291 (1962)).

Here, Plaintiffs offer no policy or fairness considerations for the Court to impose a duty of care. Nor do Plaintiffs cite any New Jersey caselaw or other authority that supports their position that such a duty exists. Rather, Plaintiffs have pled that Rte. Brokers and Eastern owe them a legal duty of care "by the nature of their far superior position and knowledge, and Plaintiffs' reliance on the representations and actions of Defendants." Compl., Sixth Count, ¶ 3. The Court previously ruled that superior knowledge alone did

13

not create a general duty requiring Coca-Cola to prevent Plaintiffs from engaging in losing business transactions with Coca-Cola's distributor, Eastern. *See* Nov. 28, 2017 Op. at 4, ECF No. 38. Likewise, the Court declines to find that an alleged "superior position and knowledge" gives rise to an independent duty of care between Defendants and Plaintiffs. Any failure by Defendants to prevent financial loss from the purchased routes was a breach of contractual duties rather than a violation of obligations imposed by law.[9] *See Saltiel,* 170 N.J. at 317 (noting law imposes duty on physicians, attorneys, insurance brokers,[10] manufacturers).

Because Plaintiffs have failed to show that Defendants owed Plaintiffs an independent duty of care imposed by law, *what* the "standard of care" may be is of no moment. *See* Raymond M. Palombi Expert Report ("Palombi Report")[11] at 8-9, Decl. of Daniel Eichhorn at Ex. B, ECF No. 124-4. Plaintiffs' motion for summary judgment for "negligence and breach of duty" is **denied.** Eastern's motion for summary judgment on the Sixth Count is **granted**.

The Court *sua sponte* grants summary judgment on the tort claims against Rte. Brokers. Plaintiffs, in moving for summary judgment against both Eastern and Rte. Brokers, have certainly had the opportunity to present their case on the tort claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence."); *see also Gibson v. Mayor and Council of the City of Wilmington,* 355 F.3d 215, 224 (3d Cir. 2004) (recognizing three grounds where court may *sua sponte* grant summary judgment despite lack of notice - "the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue").

F. Breach of Contract Counterclaim Regarding Promissory Note

Eastern seeks judgment against Bergen on its counterclaim for the principal, interest, fees, and other amounts due under the $50,000 Promissory Note. There is no dispute that Bergen failed to make the requisite monthly payments. Lawler has only paid $1,900, approximately two payments, on the Note. Lawler Dep. 30:6-8. However, Bergen argues that it is relieved from further performance of the contract due to Eastern's material

---

[9] Plaintiffs misconstrue the Court's prior statement that the "due diligence theory" was "central to Plaintiff's case." *See* Nov. 12, 2020 Op. at 3, ECF No. 110. That was not a ruling by the Court that a duty of care exists, but merely a recognition that the requested discovery was pertinent to a central theory of Plaintiffs' case.

[10] A member of the public sues an insurance broker not on a "contract of insurance," but on the failure to perform the duty of procuring a valid policy. *Rider v. Lynch,* 42 N.J. 465, 477 (1964).

[11] The Palombi Report refers to franchise law, real estate law, and trade association standards, none of which are even applicable to Eastern.

14

breach of the Agreement. *See Fox y Garcia Constr. & Dev. Corp. v. Brijall Realty Corp.*, 92 N.Y.S.3d 703 (N.Y. Civ. Ct. 2017) ("when a party has breached a contract that breach may excuse the non-breaching party from further performance if the breach is material").[12] Alternatively, even if its duty to perform under the Note is not relieved, Bergen contends that it is entitled to a set-off and damages that may exceed the amount owed on the Note, and thus, liability on the Note should be determined at trial. The Court agrees. Eastern's motion for judgment against Bergen on the Promissory Note is **denied.**

## IV. CONCLUSION

For the reasons noted above, Plaintiffs' motion for summary judgment is **denied.** Eastern's motion for summary judgment is **granted** only as to Plaintiffs' tort claims. The Fifth and Sixth Counts are **dismissed** against Eastern and Rte. Brokers.

*/s/ William J. Martini*
**WILLIAM J. MARTINI, U.S.D.J.**

March 21, 2022

---

[12] Paragraph IX of the Promissory Note states that it is governed by the laws of the "State of Execution," which the parties do not dispute was New York.